STATE OF MINNESOTA      )
                        )   AFFIDAVIT OF TAYLOR ARNESON
COUNTY OF HENNEPIN      )

I, Taylor Arneson, being first duly sworn under oath, depose and state as follows:

1. I am a Special Agent (SA) with the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) in Saint Paul, Minnesota, and have been duly employed in this position since September 2020. As a Special Agent with HSI, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, and HSI Special Agent Training Program (HSISAT), also in Glynco, Georgia. I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 922 of Title 18 of the United States Code. Prior to my employment with HSI, I was employed by the Coon Rapids Police Department, in Coon Rapids, Minnesota, for over twelve (12) years. During my tenure as a Police Officer with the Coon Rapids Police Department, I was assigned as a Detective to the Anoka Hennepin Narcotics and Violent Crimes Task force and participated in numerous investigations that involve possession of firearms by prohibited persons.

2. This affidavit is submitted for the purpose of establishing probable cause in support of a federal criminal complaint and warrant for the arrest of the following persons:

    a. Aaron Maurice Admir HARRIS; and

    b. Dion Darnell MILLER.

3. Based upon all of the facts and information set forth in this affidavit, your Affiant believes that probable cause exists to believe that Aaron Maurice Admir HARRIS and Dion Darnell MILLER knowingly and willfully conspired to knowingly, intentionally and forcibly assault and interfere with a federal law enforcement officer, including by means and use of a deadly and dangerous weapon, in violation of 18 U.S.C. §§ 111(a), 111(b) and 371; as well as and using, carrying, and brandishing a firearm during and in relation to a crime of violence, namely assault of a federal law enforcement officer, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

4. The facts set forth in the Affidavit are based upon my review of reports, my personal investigation, and discussions I have had with other law enforcement personnel. This affidavit contains information to support probable cause, but is not intended to convey each and every fact of the entire investigation, and does not set forth all of law enforcement's knowledge about this matter.

## Background

5. In March 2023, members of a joint law enforcement team which included participants from the Ramsey County Violent Crimes Enforcement Team (VCET), Homeland Security Investigations (Homeland), the Minnesota Bureau of Apprehension (BCA), the Drug Enforcement Administration (DEA), and other entities were involved in an ongoing investigation of the distribution of fentanyl pills in the eastern metropolitan aspect of the Twin Cities.

6. On March 30, 2023, law enforcement arranged to conduct a controlled purchase using an undercover officer (UC). The UC is a sworn and licensed peace officer in the State of Minnesota and has been since 1999, has participated in numerous state and federal criminal investigations related to the illicit possession and distribution of controlled substances as well as other offense, and in 2018 was assigned to the Drug Enforcement Administration ("DEA") in Minneapolis, Minnesota, as a Task Force Officer (TFO) in Task Force Group 2. Moreover, since 2018 the UC has been deputized as a DEA TFO pursuant to the authority granted to the Attorney General by Public Law 99-570, Section 1869 and delegated to the Administrator of the DEA, pursuant to Title 28, Code of Federal Regulations, subpart R, Section 0.100 *et seq*. As such, since 2018 UC has been an investigative and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) – empowered to conduct investigations of, and to make arrests for, the offenses enumerated at 18 U.S.C. § 2516.

## The Assault on a Federal Law Enforcement Officer

7. As part of the investigation the UC was provided a phone number to conduct a controlled purchase on March 30, 2023. Using the UC, law enforcement anticipated purchasing approximately 1,600 counterfeit oxycodone pills containing fentanyl (commonly referred to as "M30s") at the cost of $2,400. Through law enforcement databases, agents determined that the phone number provided to the UC belonged to Dion Darnell MILLER. The same phone number also indexed to MILLER's address on the 600 block of Van Buren in St. Paul, Minnesota, and that same address on the 600 block of Van

Buren was currently on MILLER's driver's registration and license information. The UC contacted the person with that phone number and was directed to go to MILLER's address.

8. After communicating with the phone number provided, the UC arrived at the 600 block of Van Buren in St. Paul at approximately 1:15 p.m. on March 30, 2023. The UC. Brought $2,400 in recorded funds to accomplish the controlled purchase. Upon arrival, the UC made contact with MILLER's phone number via text message to let MILLER know the UC was present. The UC received a reply from MILLER's phone number indicating someone would be there in the near term.

9. Shortly thereafter a silver Volkswagen bearing Minnesota license plate JTW402 pulled up and parked on the side of the street across from the UC. Meanwhile, various law enforcement officers observed the vehicle contained two occupants: MILLER in the rear driver's side passenger seat, and HARRIS in the drivers' seat. As the Volkswagen parked the UC received a text message from MILLER's phone number stating: "in this silver car front seat." Based on training and experience, the UC in his role as undercover took the text to mean that the UC should go to the silver Volkswagen that recently parked near the UC, enter the silver Volkswagen, and get into the front passenger seat.

10. The UC proceeded to the passenger side of the Volkswagen, opened the front passenger side door, and engaged HARRIS and MILLER in conversation. HARRIS told the UC to get in the Volkswagen, to which the UC first refused based on the circumstances observed up to that point. Both HARRIS and MILLER continued to encourage the UC to

enter the vehicle, and the UC got into the front passenger seat, but left the car door open and the UC's right leg draped outside the vehicle.

11. Meanwhile, the UC upon sitting inside the Volkswagen, could see MILLER sitting in the rear driver's side seat wearing a red hooded sweatshirt and a black, red and white Chicago Bulls jacket. The UC asked if "we're good?" – a drug transaction convention meant to indicate the desire to see the at-issue narcotics before providing any currency, or to insure the transaction was to still occur.

12. HARRIS, who was wearing a distinctive shiny black winter jacket, again asked the UC for the money. The UC again asked to first see the narcotics. In response, HARRIS told the UC that "Dion's got it" and indicated toward MILLER. At this point the UC noticed MILLER reach into his jacket while MILLER told the UC instead that HARRIS "got it." And HARRIS repeatedly stated "I got it." Meanwhile, the UC observed MILLER reach into his jacket and draw a black semi-automatic handgun from the left aspect of MILLER's torso. More specifically, the UC observed MILLER brandish what appeared to be a 9mm handgun with an extended magazine that also had a laser sighting apparatus. MILLER pointed the handgun at the UC's face and torso while both MILLER and HARRIS each repeatedly told the UC to "give it up." In response, the UC threw the money and his phones down inside the silver Volkswagen, MILLER and HARRIS (using expletives) both told the UC to get out of the vehicle, and the UC was able to run away to safety.

13. Surveillance officers and other responding law enforcement immediately followed MILLER and HARRIS in the silver Volkswagen vehicle to an address in the 900 block of St. Anthony Avenue in St. Paul, where HARRIS parked in the driveway. Both MILLER and HARRIS entered the residence, a perimeter was set up around the location, and additional law enforcement continued to arrive.

14. Both MILLER and HARRIS surrendered themselves to law enforcement after additional law enforcement arrived at the address, including a S.W.A.T. team. MILLER and HARRIS were taken into custody and there were no other occupants inside the residence. Both the residence and the Volkswagen were searched pursuant to search warrants. On the front porch of the residence (a location officers observed HARRIS at as they initially approached the residence), law enforcement located a 9mm Taurus Model semi-automatic handgun, model Model PTIII, serial number TIP20996. The 9mm Taurus handgun contained an extended and loaded magazine, was loaded with a round in its chamber, and was equipped with a laser sighting apparatus. The 9mm Taurus is also a reported stolen firearm. Also from the porch law enforcement recovered the clothing worn by MILLER and HARRIS during the offenses described above. Law enforcement also recovered $2,400.00 in recorded controlled buy funds from a bedroom on the top floor of the residence. Four cellular phones were also recovered from the home.

  

Further your Affiant sayeth not.

Taylor Arneson
Homeland Special Agent

SUBSCRIBED and SWORN before me on this 31 day of March, 2023.

Tony N. Leung
United States Magistrate Judge